**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 2:09 CR 43 |
| ) | |
| JUSTIN P. CEPHUS, *et al.*, ) | |
| ) | |
| Defendants. ) | |

## OPINION AND ORDER

This matter is before the Court on the Motion to Suppress, filed by Defendant, Delbert Patterson, on September 4, 2009 [DE #95]. For the reasons set forth below, the motion is **DENIED**. Furthermore, this Court reminds the parties that this case is the primary setting for trial on November 2, 2009.

BACKGROUND

On July 2, 2009, Defendant, Delbert Patterson, was charged in a superseding indictment with five counts, all relating to a prostitution ring. Specifically, Patterson was charged with conspiring with co-defendants Justin Cephus, Jovan Stewart, Stanton Cephus, and Haneef Jackson-Bey to defraud the United States in violation of Title 18, United States Code Section 371 (Count 1); aiding and abetting in violation of Title 18, United States Code Section 2; and with two substantive violations each of Title 18, United States Code Sections 1591(a)(1) (Counts 8 and 10), and

Section 2421 (Counts 11 and 20).

Patterson has moved to suppress the statements made by him to federal agents on March 26, 2009, and July 6, 2009. Patterson claims the statements were obtained in violation of his Fifth and Sixth Amendment Rights. Specifically, Patterson argues the statement he made to agents on March 26, 2009, was improper because he did not receive a Miranda warning, and it was a custodial interrogation in which his confession was coerced. Because the first statement should be suppressed, argues Patterson, the second statement should also not be admissible. In response, the Government urges that Miranda warnings were not needed because the first interview was not custodial in nature, and the confession was not coerced. Thus, the Government contends, the second statement was proper as well.

After briefing was completed on this Motion to Suppress, the Court held an evidentiary hearing on this matter and whether the confessions were voluntary. The hearing occurred on October 14, 2009, at which: Federal Bureau of Investigation ("FBI") Special Agents Landau, Warren, and Hendon testified; as well as Patterson's mother, Denise Preston. In making the following findings of fact, the Court considered the exhibits offered into evidence during the hearing, testimony submitted during the hearing, the credibility of the witnesses, and the parties' legal memoranda (submitted both before and after the hearing).

FINDINGS OF FACT

Somewhere between 9:00 a.m. and 9:30 a.m. on the morning of March 26, 2009, three FBI special agents went to Defendant's mother's (Denise Preston) house in Steger, Illinois. Agents Landau and Warren attended (female co-case agents), as well as Agent Hendon (who was asked to attend the interview for several reasons, including because the agents knew Patterson had a large family with many brothers).[1] Although the agents had met that morning at the local Steger Police Department, no officers from the Steger Police accompanied them to Preston's house that day.[2] According to Agent Landau, Patterson was considered a target at the time in the ongoing investigation of the prostitution ring, and the agents wanted to interview Patterson to get his side of the story.

The agents knocked on the front door,[3] identified themselves, and asked to speak to Patterson. The agents were dressed in plain clothes and were armed. Preston invited them inside her house,

---

[1] Preston testified that at first, there were four agents present (two females and two males). However, this Court finds all three agents' testimony that there were only three agents (two females and one male) more reliable and credible.

[2] Preston testified that she saw a Steger Police Department vehicle parked at the curb in front of her home. However, this Court believes she was mistaken - the Steger police accompanied the agents on the date of Patterson's arrest - not on the date of the first interview.

[3] According to Preston, a male agent first knocked on her back door. But it is undisputed that all three agents actually entered her house through the front door.

3

walked them through her house to her office, cleared space on the coffee table, and directed each agent where to sit. She then called her son, Patterson (who was 19 years old at the time), who then entered the office.

All three agents testified that they remembered someone telling Patterson at the beginning of the interview that he was free to leave, and that he did not need to talk to them. However, none of the agents explicitly remembered who told Patterson this information. In contrast to the agents' testimony, Preston testified that no one ever told Patterson he could leave or that he did not have to talk to the FBI. Patterson was not read any Miranda rights, and the agents testified they did not believe it was necessary because Patterson was not in custody.

Preston remained in the interview almost the entire time. She excused herself four times (twice to answer the phone, once to check on a baby in the house, and once to get some air). The agents asked her to leave the room only during their questioning of Patterson's girlfriend. The agents testified that Preston was quite involved in the interview. She repeatedly encouraged Patterson to tell the truth, made comments, and at times rephrased questions directed to her son.

Initially, Patterson did not admit his involvement in any illegal activity. Agent Landau told Patterson something to the effect that she would hate for the next time that she saw him for

4

her to have an arrest warrant in her hand. Moreover, Agent Landau told Patterson that his co-defendant, Justin Cephus, had implicated him in the prostitution ring. Landau admits that this information about Cephus was false. Although some witnesses had said that Patterson was involved, Cephus did not implicate Patterson. Landau encouraged Patterson to tell his side of the story, claiming otherwise they only had the other witnesses' version to rely upon.

The agents all universally testified that they never physically or verbally threatened Patterson. Landau (a female agent who is only about 5'3") said she might have raised her voice when she was frustrated at Patterson's initial denial of the events, but she never threatened Patterson. Landau also told him that the charges Patterson were facing were serious and held stiff penalties. One agent said something to the effect of they were not coming in as "asshole cops," but rather were trying to be respectful and allow Patterson to give his side of the story. It is undisputed that Patterson was never handcuffed, no doors were locked, and no doorways were blocked. Preston testified that one agent said if Patterson did not cooperate, they would take him down to the station, but they preferred to get the answers at the house. Eventually, Patterson did talk to the agents and provided a quite detailed statement about his involvement. (DE #104, Ex. 1, FBI 302 of Patterson's March 26, 2009 interview.)

Neither Patterson nor his mother told the agents that

Patterson suffers from dyslexia or any other learning disability, or has difficulty understanding or communicating. Agent Landau testified that Patterson did not have any difficulty understanding the questions or communicating during the interview and that, in fact, he was one of the most articulate people involved in this case.[4] However, Preston testified that Patterson was home schooled for many years before he attended special education, and that he had a learning disability - he was dyslexic and could not "hear phonics." Preston testified that Patterson has problems reading and understanding questions, and that questions have to be repeated over and over for him to understand.

Agent Hendon left the interview a little before the other two agents, at approximately 10:30-11:00 a.m. Agents Landau and Warren left at approximately 11:30 a.m. Preston admittedly hugged the female agents before they left and Preston testified that she believed they were cooperating with the FBI.

Over three months later, Patterson was arrested. Preston voluntarily arranged for Patterson to come to her home so that the

---

[4] During the hearing, the Court also took judicial notice of the following testimony given under oath by Patterson at his August 18, 2009, detention hearing:
    Q: Do you read, write, and understand the English language?
    A: Yes, sir.
    Q: Do you have any physical condition or mental condition that might make it hard for you to understand what's going on here in the courtroom?
    A: No, sir.
(Transcript from Detention Hearing in front of Magistrate Judge Paul R. Cherry, Aug. 18, 2009, lines 3-4, 8-11.)

FBI could arrest him and take him to the Steger Police Department for questioning. At the beginning of this questioning on July 6, 2009, Agent Landau read Patterson his Miranda rights and had him read the last two sentences of the rights. Then, an agent read the FBI 302 summary of Patterson's first interview (DE #104, Ex. 1), and asked Patterson if he had any corrections. Patterson confirmed that the information in the first statement was correct, and made no changes. Patterson then provided additional information about his involvement in Cephus' prostitution business. (DE #104, Ex. 2, FBI 302 of Patterson's July 6, 2009 interview.)

CONCLUSIONS OF LAW

Under *Miranda v. Arizona*, 384 U.S. 436, 444 (1966), a suspect interrogated by law enforcement officers while in custody must be notified of his constitutional rights to counsel and against self-incrimination. Before Miranda warnings are required, however, the suspect must be both "in custody" and subjected to "interrogation." *United States v. Thompson*, 496 F.3d 807, 810 (7th Cir. 2007) (quoting *United States v. Barker*, 467 F.3d 625, 628 (7th Cir. 2006)).

A suspect is "in custody" for Miranda purposes when there is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Thompson*, 496 F.3d at 810 (quoting

7

*Barker*, 467 F.3d at 628). "Custody 'implies a situation in which the suspect knows he is speaking with a government agent and does not feel free to end the conversation; the essential element of a custodial interrogation is coercion.'" *United States v. Salyers*, 160 F.3d 1152, 1159 (7th Cir. 1998) (quoting *United States v. Martin*, 63 F.3d 1422, 1429 (7th Cir. 1995)).

The inquiry into whether a suspect is in custody is an objective one – the Court looks to the totality of the circumstances and considers whether a reasonable person would have believed that he was free to leave. *Barker*, 467 F.3d at 629 (citing *United States v. Lennick*, 917 F.2d 974, 977 (7th Cir. 1990)). Factors to consider include whether the encounter occurred in a public place, whether the suspect consented to speak with the officers, whether the officers informed the individual that he was not under arrest and was free to leave, whether the individual was moved to another area, whether there was a threatening presence of several officers and a display of weapons or physical force, and whether the officers' tone of voice was such that their requests were likely to be obeyed. *Id.*

A confession is considered voluntary "if, in the totality of the circumstances, it is the product of a rational intellect and free will and not the result of physical abuse, psychological intimidation, or deceptive interrogation tactics that have overcome the defendant's free will.'" *United States v. Ross*, 510 F.3d 702,

709 (7th Cir. 2007) (quoting *United States v. Huerta*, 239 F.3d 865, 871 (7th Cir. 2001)). Patterson cites to *United States v. Montgomery*, 14 F.3d 1189, 1194 (7th Cir. 1994) (superseded on other grounds), for the proposition that when considering coercion from the perspective of a reasonable person, the characteristics of the accused may be taken into account. Specifically, the Court may consider "the age of the defendant, his lack of education or low intelligence, the lack of any advice to him of his constitutional rights, the length of his detention, the repeated and prolonged nature of the questioning, and the use of physical punishment." *Id.* at 1194-95 (quoting *Pharr v. Gudmanson*, 951 F.2d 117, 120 (7th Cir. 1991)). However, it is well settled that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." *Colorado v. Connelly*, 479 U.S. 157, 167 (1986). The Seventh Circuit has interpreted this to mean that "[a]bsent a showing of some type of official coercion . . . a defendant's personal characteristics alone are insufficient to render a confession involuntary." *Watson v. DeTella*, 122 F.3d 450, 453 (7th Cir. 1997).

Was There A Custodial Interrogation?

Considering the totality of the circumstances present here, a

9

reasonable person would not have believed he was in custody. The interview occurred in a public place - Patterson's mother invited the agents into her home, and Patterson agreed to be questioned. *See Beckwith v. United States*, 425 U.S. 341, 347-48 (1976) (finding a coercion-free, three-hour interview in suspect's home who was the "focus" of an investigation did not implicate *Miranda*); *Thompson*, 496 F.3d at 811 (holding suspect was not in custody during several hour interview at his home, thus Miranda warnings were not required). A person can be "in custody" for purpose of *Miranda* in his own home. *See, e.g., Orozco v. Texas*, 394 U.S. 324, 326-27 (1969) (finding Miranda warnings were necessary for interrogating defendant in his bedroom at 4:00 a.m. when the officer said defendant was under arrest); *Sprosty v. Buchler*, 79 F.3d 625, 643 (7th Cir. 1996) (finding suspect was in custody during interrogation at his mobile home when he was prevented from leaving during search of his home and an armed officer guarded the suspect for three hours during the search). However, the location of the questioning in Patterson's mother's familiar home weighs against a finding of custody.

This case is analogous to *Thompson*, in which the suspect invited the agents into his home and agreed to be questioned, where the agents did not physically restrain the suspect, raise their voices, or display weapons in an intimidating manner. *Thompson*, 496 F.3d at 811. Similarly, in this case, Patterson's mother

10

invited the plain-clothed agents into her home office. Patterson voluntarily agreed to speak with the agents. Although Agent Landau may have raised her voice in frustration, there is no evidence of verbal abuse or threats. There is also no evidence that Patterson ever tried to leave the room, or that he or his mother made any request that was denied. Patterson was not physically restrained, and he was not touched in a threatening or intimidating manner. Although there were three FBI agents present, two of the agents were female, and the record does not reflect that any of the agents threatened Patterson in any way or that they brandished weapons. *See Thompson*, 496 F.3d at 811 (stating "close proximity" of two FBI agents alone was not sufficient to render interrogation custodial). Additionally, Patterson's mother was present for almost the entire interview which lasted, at most, 2 ½ hours. The fact that Preston hugged the female agents at the completion of the interview is quite indicative of the civil nature of the interview.

Although the agents were unsure which specific agent actually informed Patterson that he was free to leave, all three unanimously testified that one of them did tell Patterson this information at the beginning of the interview. This Court finds the agents' testimony credible that one of the agents did indeed tell Patterson that he was free to leave and that he did not need to talk to them. Even assuming, *arguendo*, the agents did *not* tell Patterson he was free to leave, this fact alone is not dispositive. *See*, *e.g.*,

*Schneckloth v. Bustamonte*, 412 U.S. 218, 226-27 (1973) (commenting that no one criteria is controlling, rather all the surrounding circumstances must be scrutinized).

Based upon the totality of the circumstances in this case, a reasonable person would have believed he was free to leave the interview in question. Because there was no custodial interrogation, Miranda warnings were not required.

Was The Confession Involuntary?

Additionally, there is no factual basis in this case to find that Patterson involuntarily incriminated himself. Patterson has not alleged any misconduct, abuse, or physical or improper mental coercion by the FBI agents who questioned him. There is no evidence whatsoever that any agent touched Patterson, much less in a threatening or intimidating manner. As to the mental tactics used by the agents in questioning Patterson, the Court finds they are all within the acceptable practice of interviewing a suspect. The agents admitted to telling Patterson they would hate to see him again when they had a warrant for him, that they did not want to be "asshole cops," that the penalties could be harsh, and that his co-defendant Cephus had implicated him (this last statement was admittedly false).

Law enforcement officers have "considerable latitude in playing on the guilt and fears of the person interrogated in order

12

to extract a confession that he will shortly regret having given." *United States v. Ceballos*, 302 F.3d 679, 694 (7th Cir. 2002) (quotation omitted). It is well established that law enforcement may "actively mislead" a defendant in order to obtain a confession, so long as a rational decision remains possible. *Id.* at 694-95 (rejecting defendant's argument that the police's false comment that another individual had implicated him overbore his will or constituted impermissible coercion); *see also Holland v. McGinnis*, 963 F.2d 1044, 1051 (7th Cir. 1992) (finding confession made after the police lied to defendant and told him a witness had seen him in the alley where the victim had been raped was voluntary); *United States v. Harris*, 914 F.2d 927, 933 (7th Cir. 1990) (explaining that police may use deceptions, including false and misleading evidence, in interrogating witnesses, and can solicit confessions by offering to reduce charges without rendering confessions involuntary). In this case, other witnesses had indeed implicated Patterson. The fact that the agents lied about Cephus in particular implicating Patterson did not overbear Patterson's will, or procure a coerced confession. Moreover, this Court is not bothered by the FBI agents telling Patterson that the charges could hold stiff penalties because, as the Seventh Circuit has held, "the police did not exceed their bounds by frightening [defendant] with the specter of jail, a prospect of which [he] must have been well aware in any event." *United States v. Sablotny*, 21 F.3d 747, 753

13

(7th Cir. 1994). In sum, the Court finds that Patterson's statement was voluntary because "in the totality of the circumstances, it is the product of a rational intellect and free will and not the result of physical abuse, psychological intimidation, or deceptive interrogation tactics that have overcome the defendant's free will." *United States v. Ross*, 510 F.3d 702, 709 (7th Cir. 2007) (quotation omitted).

Additionally, this Court rejects Patterson's argument that his confession was involuntary because he was only nineteen years old and has learning disabilities (including difficulty with reading and comprehension). First, Patterson's confession in the first interview cannot be deemed involuntary on the basis of his personal characteristics alone; rather, there must have been some official coercion. *See United States v. Lawal*, 231 F.3d 1045, 1048-49 (7th Cir. 2000) ("Because there was no suggestion of police coercion, the district court correctly denied [defendant's] motion to suppress his confessions as involuntary."). Here, Agent Landau's (a 5'3" female agent) possibly raising her voice in frustration, simply does not rise to the level of improper coercion. Nor does informing Patterson that the charges hold stiff penalties constitute coercion. Second, this Court questions the truthfulness of Preston's testimony regarding her son's alleged learning disability and ability to understand and communicate. Clearly, Preston has a motive to protect her son. Furthermore, Agent Landau

14

explicitly testified that Patterson had no difficulty understanding the interview and that, in fact, he was one of the most articulate individuals she had interviewed in this case.  Landau's assessment of Patterson's ability to understand and communicate comports with the extensively detailed statements Patterson made to the agents (*see* DE #104, Ex. 1, FBI 302 of Patterson's March 26, 2009 interview; DE #104, Ex. 2, FBI 302 of Patterson's July 6, 2009 interview), and his sworn testimony before Magistrate Judge Paul Cherry during Patterson's detention hearing that he had no condition that impeded his ability to understand the courtroom proceedings.  Thus, there is no basis upon which to suppress Patterson's March 26, 2009, statement made to the FBI agents.

In light of this Court's finding that Patterson was not "in custody" during the first interview, and that his initial statements were not involuntarily coerced, Patterson's challenge to the subsequent interview on July 6, 2009, also fails.  Again, this Court has found that Patterson's Miranda rights were not violated during the first interview on March 26, 2009, because it was non-custodial.  Thus, the statement procured on July 6, 2009, after Miranda warnings were given, is also admissible.

CONCLUSION

For the foregoing reasons, the Motion to Suppress is **DENIED**.

This Court reminds the parties that this case is the primary setting for trial on November 2, 2009.

**DATED: October 21, 2009**                    **/s/ RUDY LOZANO, Judge**
                                               **United States District Court**